# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

<table>
<tr><td>CVR REFINING, LP, et al.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiffs,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>C.A. No. N21C-01-260 EMD CCLD</td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>XL SPECIALTY INSURANCE COMPANY, et al.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
</table>

Submitted: July 7, 2021
Decided: November 23, 2021

*Upon Plaintiffs' Motion for Partial Summary Judgment on Count I*
***GRANTED***

Jennifer C. Wasson, Esquire, Carla M. Jones, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Robin L. Cohen, Esquire, Alexander M. Sugzda, Esquire, Cohen Ziffer Frenchman & McKenna, New York, New York. *Attorneys for Plaintiffs CVR Refining, LP, CVR Refining GP, LLC, CVR Refining Holdings, LLC, CVR Energy, Inc. and David Lamp*

Herbert Beigel, Esquire, Law Offices of Herbert Beigel, Tucson, Arizona. *Attorney for Plaintiffs Carl C. Icahn and Icahn Enterprises L.P.*

Robert J. Katzenstein, Esquire, Smith Katzenstein & Jenkins LLP, Wilmington, Delaware, Leland H. Jones, Esquire, Chiara Tondi Resta, Esquire, Wiley Rein LLP, Washington, D.C. *Attorneys for Defendant XL Specialty Insurance Company.*

John C. Phillips, Jr., Esquire, David Bilson, Esquire, Phillips McLaughlin & Hall, P.A., Wilmington, Delaware, Michael P. Duffy, Esquire, Scarlett M. Rajbanshi, Esquire, Boston, Massachusetts. *Attorneys for Defendant Twin City Fire Insurance Company.*

John C. Phillips, Jr., Esquire, David Bilson, Esquire, Phillips McLaughlin & Hall, P.A., Wilmington, Delaware, Erica J. Kerstein, Esquire, Robinson & Cole LLP, New York, New York. *Attorneys for Defendant Allianz Global Risk US Insurance Company.*

John C. Phillips, Jr., Esquire, David Bilson, Esquire, Phillips McLaughlin & Hall, P.A., Wilmington, Delaware, Geoffrey W. Heineman, Esquire, Ropers Majeski, P.C. *Attorneys for Defendant Argonaut Insurance Company.*

**DAVIS, J.**

## I. INTRODUCTION

This insurance coverage dispute is assigned to the Complex Commercial Litigation Division of the Court. Plaintiffs CVR Refining, LP ("CVR Refining"), CVR Refining GP, LLC (the "General Partner"), CVR Refining Holdings, LLC ("CVR Holdings"), CVR Energy, Inc. ("CVR Energy"), Icahn Enterprises, LP ("IELP"), Carl. C. Icahn, and David L. Lamp (collectively, the "Insureds" or "Plaintiffs") assert claims against Defendants XL Specialty Insurance Company ("XL"), Twin City Fire Insurance Company ("Twin City"), Allianz Global Risks US Insurance Company ("Allianz"), Argonaut Insurance Company ("Argonaut"), and Allied World National Assurance Company ("AWAC") (collectively, the "Insurers"). Specifically, Plaintiffs allege that: (i) all the Insurers anticipatorily breached insurance policies by denying defense costs coverage for Mr. Icahn, IELP and CVR Energy ("Count I"); (ii) all the Insurers anticipatorily breached the policy by denying coverage of Plaintiffs' indemnity costs ("Count II"); and (iii) the Insurers breached the implied covenant of good faith and fair dealing by refusing to cooperate with Plaintiffs prior to a mediation or to provide coverage for any settlement reached at that mediation ("Count III").

The Insurers moved to dismiss, or alternatively, to stay this action under *McWane*[1] (the "*McWane* Motion"). In addition, Plaintiffs moved for summary judgment on Count I of the Complaint (the "Partial SJ Motion"). The Court held a hearing on the *McWane* Motion and the Partial SJ Motion on July 7, 2021. After the hearing, the Court took both matters under advisement. On August 11, 2021, the Court issued a decision denying the *McWane* Motion.

For the reasons set forth below, the Court will **GRANT** the Partial SJ Motion.

---

[1] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.*, 263 A.2d 281 (Del. 1970).

## II.     RELEVANT FACTS

### A. THE PARTIES

All five corporate plaintiffs are Delaware entities.  CVR Refining is an oil refiner and marketer of transportation fuels organized as a limited partnership in Delaware.[2]  CVR Refining's principal place of business is Texas.[3]  The General Partner is a Delaware LLC and is an indirectly wholly owned subsidiary of CVR Energy through CVR Holdings.[4]  The General Partner is the general partner of CVR Refining, and has direct responsibility for CVR Refining's business and operation management.[5]  CVR Holdings is a Delaware LLC and is an indirectly wholly owned subsidiary of CVR Energy.[6]  CVR Energy is a Delaware corporation with its principal place of business in Texas.[7]  Finally, IELP is a Delaware limited partnership.[8]

There are two individual plaintiffs—Mr. Icahn and Mr. Lamp.  Mr. Icahn served as the General Partner's chairman from January 2013 to July 2018, as well as CVR Energy's chairman from June 2012 to July 2018.[9]  At all relevant times, Mr. Icahn, directly or indirectly, wholly owned the general partner of IELP and owned approximately 91% of IELP's outstanding depositary units.[10]  Mr. Lamp has been a director of CVR Energy and the General Partner since January 2018.[11]  Since December 2017, Mr. Lamp has also been the president and CEO of both CVR Energy and the General Partner.[12]

---

[2] Compl. ¶ 11.
[3] *Id.*
[4] *Id.* ¶ 12.
[5] *Id.*
[6] *Id.* ¶ 13.
[7] *Id.* ¶ 14.
[8] *Id.* ¶ 15.
[9] *Id.* ¶ 16.
[10] *Id.*
[11] *Id.* ¶ 17.
[12] *Id.*

The Defendants are all insurers. XL is a Delaware corporation with its principal place of business in Connecticut.[13] XL is an insurance company licensed to do business in the state of Delaware.[14] Twin City is an Indiana corporation with its principal place of business in Connecticut and is an insurance company licensed to do business in Delaware.[15] Allianz and Argonaust are Illinois corporations and are licensed to do business in Delaware.[16] Allianz has its principal place of business in Illinois.[17] Argonaust has Texas as its principal place of business.[18] AWAC is a New Hampshire corporation with its principal place of business in New York and is an insurance company licensed to do business in Delaware, among other states.[19]

## B. THE POLICIES[20]

XL issued Executive and Corporate Securities Liability Insurance ELU159007-18 (the "XL Primary Policy" or "Policy") to CVR Energy.[21]

The Policy requires, in part, for XL to advance defense costs:

(C)     Upon the written request of:

(1)     the Company (or with respect to a Claim or Interview to which Insuring Agreements (A) or (D) apply, an Insured Person), the Insurer will advance Defense Expenses, no later than 60 days after the Insurer's receipt of invoices and any additional information reasonably requested by the Insurer documenting such Defense Expenses, in excess of the applicable Retention, if any, before the disposition of the Claim, Interview or Investigation Demand for which this Policy provides coverage; or

(2)     an Insured Person with respect to a Claim or Interview to which Insuring Agreements (B) or (C) apply (or would apply but for the

---

[13] *Id.* ¶ 18.
[14] *Id.*
[15] *Id.* ¶ 19.
[16] *Id.* ¶¶ 20 and 21.
[17] *Id.* ¶ 20.
[18] *Id.* ¶ 21.
[19] *Id.* ¶ 22.
[20] The Policies are not directly at issue in the *McWane* Motion. The Court is discussing the Policies in depth to provide context as to the coverage dispute between Plaintiffs and the Insurers.
[21] *Id.* ¶ 26.

Company's failure or refusal to pay Defense Expenses on behalf of such Insured Person), solely in the event that the Company fails or refuses to indemnify the Insured Person for Defense Expenses within 60 days of a written request of the Insured Person, the Insurer will advance Defense Expenses on a current basis, but not later than 60 days, after the Insurer's receipt of invoices and any additional information reasonably requested by the Insurer documenting such Defense Expenses, in excess of the applicable Retention, before the disposition of the Claim or Interview for which this Policy provides coverage, subject in all events to Section VI. General Condition (G) of this Policy.[22]

The Policy sets out the Limit of Liability:

**Item 3. Limit of Liability:**[23]

(A) $1,000,000       Maximum Aggregate Sublimit of Liability each **Policy Period** for all **Investigation Demands**

(B) $10,000,000       Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Loss** from all **Claims**, **Investigation Demands**, and **Interviews**.[24]

The Policy also specifies the Retentions:

**Item 4. Retentions:**

$0       Each **Insured Person** under INSURING AGREEMENT I (A) or (D)

$1,000,000       each **Claim**, other than a **Securities Claim**, under INSURING AGREEMENT I (B) or (C).

$1,000,000       each **Securities Claim** under INSURING AGREEMENT I (B) or (C)

$0       each **Investigation Demand** under INSURING AGREEMENT I (F)[25]

---

[22] Bourne Decl. Ex. 1 (hereinafter "XL Primary Policy") Endorsement No. 26.
[23] Words in bold appear in bold in the XL Primary Policy.
[24] *Id.* Item 3.
[25] *Id.* Item 4.

Under the XL Primary Policy, XL provided $10 million in coverage in excess of a $1 million retention. Endorsement No. 23, however, provides a higher retention limit for claims arising from mergers and acquisitions:

> . . . solely with respect to any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any: (a) acquisition, assumption, merger, consolidation or otherwise of any entity, asset, Subsidiary or liability described in Section VI General Conditions (D)(1) and (2); or (b) Change in Control, Item 4 of the Declarations is amended to read in its entirety as follows:
>
> Item 4. Retentions
>
> | | |
> |---|---|
> | $0 | each Insured Person under Insuring Agreement I (A) or (D) |
> | $2,500,000 | each Claim, other than Securities Claim, under INSURING AGREEMENT I (B) OR (E) |
> | $2,500,00 | each Securities Claim under INSURING AGREEMENT I (B) OR (C) |
> | $0 | each Investigation Demand under INSURING AGREEMENT I (F)[26] |

Endorsement 23 is entitled "Mergers & Acquisitions Endorsement" and is augmented by Section VI(D) of the Policy.

Section VI General Conditions (D) is titled "Mergers and Acquisitions (Changes in Exposure or Control)" Section VI(D), in relevant part, provides:

> (1)     If during the Policy Period the Company acquires any entity by merger, consolidation or otherwise such that the entity becomes a Subsidiary, coverage shall be provided for any Loss involving a Claim, Interview or Investigation Demand for a Wrongful Act occurring after the consummation of the transaction.
>
> (2)     If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the assets or liabilities so acquired or so assumed as a result of such acquisition, exceed forty percent (40%) of the total assets or liabilities, respectively, of the Company, as represented in the Company's most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days or to the Expiration Date, whichever occurs first, for any Loss involving a Claim, Interview or Investigation Demand for a Wrongful Act that occurred after the transaction

---

[26] *Id.* Endorsement No. 23.

has been consummated. Coverage beyond such period will be provided only if:

> (a) the Insurer receives written notice containing full details of the transaction(s); and

> (b) the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.[27]

Sections VI(D)(1) and (2) seems to relate to those situations where the originally anticipated risk of loss is greater due to a merger or acquisition and, therefore, the retention gets adjusted upward.

There are three potentially applicable Insuring Agreements:

> (A) The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Person** during the **Policy Period** for a **Wrongful Act**, except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

> (B) The Insurer shall pay on behalf of the **Company Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** as indemnification.

> (C) The Insurer shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** for a **Wrongful Act**.

> …[28]

"**Loss**" is a defined term:

> "**Loss**" means damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiplied damages, where insurable by law) that any **Insured** is legally obligated to pay and **Defense Expenses**, including that portion of any settlement which represents the claimant's attorneys' fees.[29]

The definition of **Loss** also has certain exclusions:

---

[27] *Id.* § VI(D)(1) and (2).
[28] *Id.* § I.
[29] *Id.* § II(O).

. . . **Loss** will not include that portion which constitutes:

(3)    any amount which is uninsurable under the law pursuant to which this Policy is construed; provided that the Insurer will not assert that the portion of any settlement or judgment in a **Claim** arising from an initial or subsequent public offering of the **Company's** securities constitutes uninsurable loss due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933);

. . .

(5)    any amount which represents or is substantially equivalent to an increase in the consideration paid, or proposed to be paid, by the **Company** in connection with its purchase of any securities or assets of any person, group of persons, or entity

. . .[30]

"**Defense Expenses**" are defined as:

"**Defense Expenses**" means reasonable and necessary legal fees, expenses and other costs (including experts' fees):

(1)    Incurred in the investigation, adjustment, settlement, defense and/or appeal of any **Claim** . . .[31]

"**Claim**" is defined under Endorsement 25:

Section II Definitions (C)(2) of the Policy is amended to read in its entirety as follows:

(2)    any civil, criminal, judicial, administrative or regulatory proceeding commenced by:

(a)    service of a complaint or similar pleading;

. . .[32]

"**Securities Claim**," by contrast, is defined:

---

[30] *Id.* §§ II(O)(3) and II(O)(5).

[31] *Id.* § II(F)(1).

[32] *Id.* Endorsement No. 25 (Amend Definition of Claim).

"**Securities Claim**" means a **Claim**, other than an administrative or regulatory proceeding against or investigation of the **Company**:

(1)      made against an **Insured** for any actual or alleged violation of any federal, state or local statute, regulation, or rule or common law regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities, which is:

        (a)      brought by any person or entity resulting from, the purchase or sale of, or offer to purchase or sell securities of the **Company**; or

        (b)      brought by a security holder of the **Company** with respect to such security holder's interest in securities of the **Company**.

        . . .[33]

Endorsement No. 42 amends the definition of "**Securities Claim**":

". . .'Securities Claim,' as defined in Section II Definitions (S) of the Policy, is amended to include any Claim, other than an administrative or regulatory proceeding against or investigation of the Company, made against any Insured for any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty arising from or in connection with the purchase or sale of, or offer to purchase or sell any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market.[34]

"**Insured**" means the **Insured Persons** and the **Company**.[35]

"**Insured Person**" is defined:

"**Insured Person**" means:

(1)      any past, present or future natural person director or officer, or member or manager of the board of managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States.[36]

Endorsement No. 46 further amends the definition of "**Insured Person**":

---

[33] *Id.* § II(S)(1).
[34] *Id.* Endorsement No. 42.
[35] *Id.* § II(I).
[36] *Id.* § II(J).

(2) any past, present or future natural person employee or intern of the Company (other than an individual described in (J)(1) above) to the extent any Claim is: (a) a Securities Claim, or (b) made and maintained against both such employee and an Insured Person as defined in (J)(1) above;"[37]

Endorsement No. 23 of the Policy increased the retention to $2.5 million for claims related to Mergers and Acquisitions.

"**Company**" is defined:

> "**Company**" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to GENERAL CONDITIONS VI (D). The term **Company** shall include any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code or any equivalent provision in any foreign jurisdiction.[38]

> "**Parent Company**" means the entity named in ITEM 1 of the Declarations.[39]

ITEM 1 names CVR Energy as the Company.[40]

"**Subsidiary**" is defined:

> "**Subsidiary**" means any entity during any time in which the **Parent Company** holds directly or indirectly:

> (1) more than fifty percent (50%) of the voting rights or issued share capital of such entity.

> . . .[41]

"**Wrongful Act**" means:

> (1) any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such;

> . . .

---

[37] *Id.* Endorsement No. 46.
[38] *Id.* § II(D).
[39] *Id.* § II(Q).
[40] *Id.* Item 1.
[41] *Id.* § II(T).

10

(3)     solely with respect to Insuring Agreement (C) of the Policy, any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by the **Company**;

. . .[42]

The XL Primary Policy also contains an allocation provision:

> If both **Loss** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim**, **Interview** or **Investigation Demand** made against the **Insured** contains both covered and uncovered matters, or because a **Claim**, **Interview** or **Investigation Demand** is made against both the **Insured** and others (including the **Company** for **Claims** other than **Securities Claims**) not insured under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of loss that is not covered under this Policy.  Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim**, **Interview** or **Investigation Demand** by, the **Insured** and others.[43]

Twin City, Allianz, Argonaut and AWAC issued excess insurance policies (collectively with XL Primary Policy, the "Policies") creating an insurance coverage tower.[44]  The Policies follow form to the XL Primary Policy.[45]

### C. THE UNDERLYING ACTIONS[46]

The coverage dispute between Plaintiffs and the Insureds arises out of two putative class action lawsuits.  Certain plaintiffs filed a lawsuit against CVR Refining in the Court of Chancery, *In re CVR Refining, LP Unitholder Litigation*, No. 2019-0062-KSJM (the "Delaware Litigation").[47]  In addition, certain other plaintiffs initiated a lawsuit in the Southern District of New York, *White Pine Investments v. CVR Refining, LP*, No. 1:20-cv-02863 (the "White Pine

---

[42] *Id.* § II(U).
[43] *Id.* § V(D).
[44] *See* Compl. ¶¶ 41-44.
[45] *See id.*; *see also* Bourne Decl. Exs. 2-5.
[46] The complaints in the Underlying Actions have been provided to the Court.  *See* Compl. Ex. F, and Bourne Decl. Exs. 6 and 7.
[47] Compl. Ex. F

Action") (collectively, the "Underlying Actions").[48] The factual allegations of both lawsuits are substantially similar.[49] The Underlying Actions contend that Plaintiffs, acting through various entities, improperly used a call right in CVR Refining's limited partnership agreement to buy out CVR Refining's public common unit holders.[50] The Delaware Litigation plaintiffs alleged that CVR manipulated the price of CVR Refining's stock to enable CVR Energy to call the plaintiffs' common units at an artificially depressed price.[51] The plaintiffs in the Underlying Actions are not parties to this civil proceeding.

The Delaware Litigation complaint names CVR Energy, CVR Refining, CVR Holdings, the General Partner, and Mr. Icahn and various individual directors and officers.[52] The Delaware Litigation alleges breach of contract against the CVR entities, breach of the implied covenant of good faith and fair dealing against the CVR entities, and tortious interference against CVR Energy and Mr. Icahn.[53]

The White Pine Action complaint names as defendants CVR Energy, CVR Refining, CVR Holdings, the General Partner, IELP, and Mr. Lamp.[54] The White Pine Action alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5; and Section 20(a) of the Exchange Act.[55]

The Court has reviewed the Underlying Actions' complaints. The Court notes that the complained of transaction involves the purchase of CVR Refining's own common units through a multi-step process involving exchange offers, call rights, etc. The transaction does not involve

---

[48] *See id.* ¶ 45. According to Plaintiffs, the White Pine Action has been voluntarily dismissed without prejudice. *See* Partial SJ Mot. Reply Br. at 1, fn. 2.
[49] *Id.*
[50] *See, e.g.*, Ex. 6 ¶¶ 1-12.
[51] *Id.* ¶ 46.
[52] *Id.* ¶ 51.
[53] *Id.* ¶ 52.
[54] *Id.* ¶ 53.
[55] *Id.* ¶ 54.

12

the purchase of any entity or the consolidation of an entity into CVR Refining. The Underlying Actions contend that Plaintiffs improperly obtained the units at a depressed price.

Plaintiffs gave notice of the Underlying Actions to the Insurers.[56] On March 25, 2019, XL contacted CVR Energy regarding coverage.[57] XL stated the Delaware Litigation constituted a **Claim** against **Insured Persons** for **Wrongful Acts** and constituted a **Securities Claim** against CVR Energy, CVR Refining, CVR Holdings and the General Partner.[58] XL denied coverage as to Mr. Icahn and IELP.[59]

### D. THE INSURERS DENY COVERAGE.

Mediation for the Delaware Litigation was scheduled for February 17, 2021.[60]

On January 8, 2021, XL sent a letter to CVR Energy, noting that coverage may not be available in the Delaware Litigation.[61] First, XL argued that the "relief sought in the Litigation may not constitute covered **Loss**" because (1) the damages are based solely on contractual obligations, (2) it is "any amount which represents or is substantially equivalent to an increase in the consideration paid, or proposed to be paid, by the **Company** in connection with its purchase of securities or assets of any person, group of persons, or entity," and (3) the amount may be uninsurable under Texas law.[62] Furthermore, XL took the position that coverage was unavailable for IEP and Mr. Icahn because IELP was not an **Insured** and that Mr. Icahn was not being sued in his capacity as an **Insured Person**.[63]

---

[56] *Id.* ¶ 55.
[57] *Id.* ¶ 56.
[58] *Id.*
[59] *Id.*
[60] *Id.* ¶ 57.
[61] *McWane* Mot. Reply Br. Ex. K (January 8 XL Letter).
[62] *Id.*
[63] *Id.*

On January 15, 2021, CVR Energy responded, setting out its position on why there was coverage under the Policies.[64] CVR requested that XL confirm by February 3, 2021 that XL "will provide coverage for any settlement reached at mediation…scheduled for February 17, 2021."[65] Instead of responding to the January 15, 2021 letter, the Insurers filed suit in Texas.

### E. PROCEDURAL POSTURE

The Insurers filed a petition in Texas District Court on January 27, 2021 (the "Texas Action").[66] The Insureds then filed the Complaint in this litigation on January 30, 2021 seeking recovery for (1) Count I—anticipatory breach of contract regarding the Insurers' denial of coverage for defense costs to Mr. Icahn, IELP, and CVR Energy; (2) Count II—anticipatory breach of contract for denying indemnity costs (Count II); and (3) Count III—breach of the implied covenant of good faith and fair dealing (Count III).[67]

The Insureds moved for partial summary judgment on Count I—XL's duty to advance defense costs on March 12, 2021.[68] The Insureds are only moving on Count I as to CVR Refining, the General Partner, CVR Holdings, CVR Energy, and Mr. Lamp. The Insureds are not, currently, moving for summary judgment as to IELP and Mr. Icahn. The Insurers oppose partial summary judgment. The Court held a hearing on the Partial SJ Motion on July 7, 2021. At the conclusion of the hearing, the Court took the Partial SJ Motion under advisement.

### III. PARTIES' CONTENTIONS

The Insureds argue that the Underlying Actions are covered claims subject to a $1 million retention under Endorsement No. 26 of the XL Primary Policy. The Insureds also claim that

---

[64] *McWane* Mot. Op. Br. at 9.
[65] *McWane* Mot. Reply Br. Ex. L (January 15 CVR Letter)
[66] *McWane* Mot. Op. Br. Ex. A (Insurers' Texas Petition).
[67] D.I. No. 1.
[68] D.I. No. 24.

Endorsement No. 23 of the XL Primary Policy, which provides for a $2.5 million retention, does not apply because it is subject to Section VI General Conditions (D)(1) and (2). Therefore, the Insurers contend that the Insurers owe a duty to defend the Insureds under the plain language of the contract.

The Insurers oppose the relief sought. The Insurers argue that the Partial SJ Motion is not based on a pleaded claim and, therefore, should be dismissed without prejudice. The Insurers also contend that Endorsement No. 23 of the XL Primary Policy applies to the Underlying Actions so the applicable retention is $2.5 million. The Insurers assert that Endorsement No. 23 is not subject to Section VI General Conditions (D)(1) and (2) because, otherwise, the endorsement would be meaningless.

## IV.    STANDARD OF REVIEW

The Court will grant summary judgment if, after viewing the record in a light most favorable to the non-moving party, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law.[69] In ruling on a summary judgment motion, the Court (i) construes the record in the light most favorable to the non-moving party;[70] (ii) detects, but does not decide, genuine issues of material fact;[71] and (iii) denies the motion if a material fact is in dispute.[72] The movant bears the initial burden of demonstrating its motion is supported by undisputed material facts.[73] If that burden is met, the non-movant must show there are material issues of fact to be resolved by a fact-finder.[74]

---

[69] *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99-100 (Del. 1992); *see* Del. Super. Civ. R. 56.
[70] *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977).
[71] *Merrill*, 606 A.2d at 99.
[72] *Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962).
[73] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).
[74] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

15

Although Summary judgment is "encouraged when possible;"[75] however, there is no "right" to summary judgment.[76] The Court may deny summary judgment if the Court is not reasonably certain that there is no triable fact issue.[77] The Court may deny summary judgment if the Court concludes a more thorough inquiry into, or development of, the facts, would clarify the law or its application.[78]

## V.  DISCUSSION

The parties do not contest choice of law in their papers. Although the factual record is not fully developed on choice of law, there is a very good chance that Delaware law will apply to the Policies.[79] Insurance policies are contracts.[80] The interpretation of contractual language, including in insurance policies, "is a question of law."[81] The principles governing the interpretation of an insurance contract are well-settled. In attempting to resolve a dispute over the proper interpretation of an insurance policy, "a court should first seek to determine the parties' intent from the language of the insurance contract itself."[82] In reviewing the terms of an

---

[75] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 443 (Del. 2005); *see Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 2021 WL 1016442, at *4 (Del. Super. Mar. 17, 2021) ("[A] matter should be disposed of by summary judgment whenever . . . a trial is unnecessary." (internal quotation marks omitted) (quoting *Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999))).

[76] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002) (internal quotation marks and citation omitted).

[77] *Cross v. Hair*, 258 A.2d 277, 278 (Del. 1969).

[78] *Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 918-19 (Del. 1965); *see Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002) ("The trial court may deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." (cleaned up)).

[79] *See RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 896-901 (Del. 2021).

[80] *Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*, 2021 WL 347015, at *7 (Del. Super. Feb. 2, 2021) (citation omitted).

[81] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 286 (Del. 2001); *see Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018) ("Whether [a] contract's material terms are sufficiently definite [is] mostly, if not entirely, a question of law." (citation omitted)); *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1232 (Del. 2017) (same).

[82] *Alstrin v. St. Paul Mercury Ins. Co.,* 179 F. Supp. 2d 376, 388 (D. Del. 2002); *see also Emmons v. Hartford Underwriters Ins. Co.,* 697 A.2d 742, 745 (Del. 1997) ("The scope of an insurance policy's coverage . . . is prescribed by the language of the policy.") (citing *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992)*; Playtex FP, Inc. v. Columbia Cas. Co.,* 622 A.2d 1074, 1076–77 (Del. Super. 1992) (citing *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del. 1985)); *Kaiser Aluminum Corp. v. Matheson,* 681 A.2d 392, 395 (Del. 1996).

16

insurance policy, the Court considers "the reasonable expectations of the insured at the time of entering into the contract to see if the policy terms are ambiguous or conflicting, contain a hidden trap or pitfall, or if the fine print takes away that which has been provided by the large print."[83] Ambiguity exists when the disputed term "is fairly or reasonably susceptible to more than one meaning."[84] Absent any ambiguity, contract terms should be accorded their plain, ordinary meaning.[85] If an insurance policy contains an ambiguous term, then the policy is to be construed in favor of the insured to further the contract's purpose and against the insurer, as the insurer drafts the policy and controls coverage.[86]

In Delaware, "[i]t is well settled that an insurer's duty to defend is broader than its duty to indemnify."[87] "The duty to defend is determined by comparing the allegations contained in the underlying complaint with the terms of the policy."[88] If there is a possibility that "the underlying complaint, read as a whole, alleges a risk within the coverage of the policy," then the insured owes a duty to defend.[89]

To determine if an insurer has a duty to defend an action against its insured, a court should use the following principles:

---

[83] *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.,* 1996 WL 111205, at *2 (Del. Super. Jan. 30, 1996) (citation omitted); *see Steigler v. Ins. Co. of N. Am.,* 384 A.2d 398, 401 (Del. 1978) ("[A]n insurance contract should be read to accord with the reasonable expectations of the purchaser so far as the language will permit.") (quoting *State Farm Mut. Auto. Ins. Co. v. Johnson,* 320 A.2d 345, 345 (Del. 1974) (internal quotation marks omitted)).
[84] *Alta Berkeley VIC. V. v. Omneon, Inc.,* 41 A.3d 381, 385 (Del. 2012).
[85] *See id.*; *see also Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2018 WL 6266195, at *4 (Del. Super. Nov. 30, 2018); *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413694, at *7 (Del. Super. Jan. 31, 2019).
[86] *See Alstrin*, 179 F. Supp. 2d at 390 ("Generally speaking, however, Delaware . . . courts continue to strictly construe ambiguities within insurance contracts against the insurer and in favor of the insured in situations where the insurer drafted the language that is being interpreted regardless of whether the insured is a large sophisticated company.") (citations omitted); *Nat'l Union Fire Ins. Co. v. Rhone–Poulenc Basic Chems. Co*., 1992 WL 22690, at *8 (Del. Super. Jan. 16, 1992) ("Application of the [*contra proferentem*] doctrine turns not on the size or sophistication of the insured, but rather on the fact that the policy language at issue is drafted by the insurer and is not negotiated." (citation omitted)).
[87] *Rhone-Poulenc*, 1992 WL 22690 at *5.
[88] *Id.*
[89] *Id.*

(a) where there exists some doubt as to whether the complaint against the insured alleges a risk insured against, that doubt should be resolved in favor of the insured;

(b) any ambiguity in the pleadings should be resolved against the carrier; and

(c) if even one count or theory of plaintiff's complaint lies within the coverage of the policy, the duty to defend arises.[90]

In Delaware, the insurer's duty to defend an insured arises as soon as the allegations of the underlying complaint "show a potential that liability within coverage will be established."[91] An insurer then can be excused from its duty to defend only if it can be determined as a matter of law that there is no possible factual or legal basis upon which the insurer might eventually be obligated to indemnify the insured."[92] Therefore, an insurer must show that the allegations of the underlying complaint are "solely and entirely within specific and unambiguous exclusions from coverage."[93]

## A. THE SJ MOTION IS NOT PROCEDURALLY DEFICIENT BECAUSE THE MOTION RELATES TO A PLEADED CLAIM.

The Insurers argue that the Partial SJ Motion is procedurally deficient because it is based on a claim not pleaded in the plaintiff's complaint.[94] Count I is cause of action for anticipatory breach of contract regarding the Policy's duty to defend. The Insureds allege that their claim under the policy relating to the Underlying Actions constitutes a cover claim implicating indemnification for "Defense Expenses."[95] The Insureds contend that no "conditions, exclusions, or provisions of the [Policy] bar coverage for any Defense Expenses relating to the Underlying Actions."[96]

---

[90] *Continental Casualty Co. v. Alexis I. du Pont School Dist.*, 317 A.2d 101, 105 (Del. 1974).
[91] *Rhone-Poulenc*, 1992 WL 22690 at *7.
[92] *Id.*
[93] *Id.* (quoting *Avondale Indus., Inc. v. The Travelers Indem. Co.*, 887 F.2d 1200, 1204 (2d Cir. 1989)).
[94] Partial SJ Mot. Answer. Br. 12.
[95] Compl. ¶ 64,
[96] *Id.* ¶ 67.

18

"The function of pleading is to give notice."[97] The Court's rules "encourage notice pleading and do not require pleading of technical exactitude."[98] The Insurers claim that the Partial SJ Motion requires the Court to rule on an unpled claim, *i.e.*, that Endorsement No. 23 does not apply to the claims based on the Underlying Actions, and therefore a $1 million retention applies.

The Partial SJ Motion, however, is based on the claim that the Insurers must advance defense costs.[99] The Complaint alleges that no provisions of the Policy bar coverage for defense costs. Endorsement No. 23 is a provision of the Policy. XL raised the retention issue by claiming it applies so that XL does not have to advance defense costs. XL also claimed that the $2.5 million retention applied on March 25, 2019.[100] Therefore, XL had notice that Endorsement No. 23's applicability would be an issue when determining its liabilities under the XL Primary Policy. The Court finds that the Partial SJ Motion is not procedurally deficient.

**B. THE POLICY IS NOT AMBIGUOUS, AND THE INSUREDS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT I AS TO THE DUTY TO DEFEND.**

Whether Endorsement No. 23 applies is a question of contract interpretation. A threshold inquiry, however, when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous.[101] "[W]here reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence."[102] Ambiguity exists "when the provisions in controversy are fairly

---

[97] *Mut. Ben. Life Ins. Co. of Newark, N.J. v. Bailey*, 190 A.2d 757, 760 (Del. 1963).
[98] *Deluca v. Martelli*, 200 A.2d 825, 828 (Del. Super. 1964).
[99] Partial SJ Mot. Op. Br. 14.
[100] Bourne Decl. Ex. 8.
[101] *United Rentals, Inc. v. RAM Holdings, Inc.,* 937 A.2d 810, 830 (Del.Ch. 2007).
[102] *GMC Capital Invest., LLC v. Athenian Venture Partners I, L.P.,* 36 A.3d 776, 783 (Del. 2012); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (reversing a grant of summary judgment where two parties had conflicting but reasonable interpretations of a contract's indemnification provision and extrinsic evidence was needed to resolve the dispute).

susceptible to different interpretations or may have two different meanings."[103]  In these cases,

summary judgment is improper because the Court must look to extrinsic evidence to resolve the

interpretation dispute.[104]  The Court does not find Endorsement No. 23 to be ambiguous.

The parties disagree whether Endorsement No. 23 applies to the claims related to the

Underlying Actions.  Endorsement No. 23 provides for a $2.5 million retention limit:

> . . . solely with respect to any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any: (a) acquisition, assumption, merger, consolidation or otherwise of any entity, asset, Subsidiary or liability described in Section VI General Conditions (D)(1) and (2); or (b) Change in Control, Item 4 of the Declarations is amended to read in its entirety as follows:
>
> Item 4. Retentions
>
> | | |
> |---|---|
> | $0 | each Insured Person under Insuring Agreement I (A) or (D) |
> | $2,500,000 | each Claim, other than Securities Claim, under INSURING AGREEMENT I (B) OR (E) |
> | $2,500,00 | each Securities Claim under INSURING AGREEMENT I (B) OR (C) |
> | $0 | each Investigation Demand under INSURING AGREEMENT I (F)[105] |

Subsection (a) involves a situation where the Insured increases the risk of loss through a

merger or acquisition.  Section VI General Conditions (D)(1) provides:

> (1)     If during the Policy Period the Company acquires any entity by merger, consolidation or otherwise such that the entity becomes a Subsidiary, coverage shall be provided for any Loss involving a Claim, Interview or Investigation Demand for a Wrongful Act occurring after the consummation of the transaction.[106]

Section VI General Conditions (D)(2) provides for the same type of transaction but one that

results in the acquired assets or liabilities exceeding 40% of the Company's total assets or

---

[103] *Id.*
[104] *GMC Capital Invest.*, 36 A.3d at 780.
[105] *Id.* Endorsement No. 23.
[106] *Id.* § VI(D)(1).

20

liabilities.[107] Subsection (b) does not apply here as the situation does not involve a "Change of Control."

The Insurers argue that Endorsement No. 23 applies because the Underlying Actions "in any way" involve the acquisition of any entity or asset.[108] Essentially, the Insurers argue that Endorsement No. 23 applies when a claim involves acquiring (i) an entity, (ii) an asset, (iii) a Subsidiary or (iv) a liability described in Section VI General Conditions D(1) and (2). This seems like a reasonable interpretation based on the provision's ordinary meaning except it does not faithfully include all the language of the endorsement.

The Insurers seem to make Section VI General Conditions into a number of separate transactions; however, Section VI General Conditions D(1) and (2) are there to create two categories of transactions in subsection (a) that would increase the deductible—one involving acquisition of a Subsidiary and one where the Company assets or liabilities by 40%. Moreover, that is the most sensible way to read Endorsement No. 23. The purpose of Endorsement No. 23 is to increase the deductible in those situations where the insurable risk is increased, *i.e.*, where entities have been added or assets and liabilities have increased due to acquisition.

The Insureds argue that Endorsement No. 23 does not apply because it is limited to situations described in Section VI General Conditions (D)(1) and (2).[109] The Insureds interpret Endorsement No. 23 to apply when a claim involves acquiring an entity, an asset, a Subsidiary or a liability described in Section VI General Conditions D(1) and (2). The Court finds that the Insureds position tracks the unambiguous language of Endorsement No. 23.

---

[107] *See id.* §V(D)(2).
[108] Partial SJ Mot. Answer. Br. 15.
[109] Partial SJ Mot. Op. Br. 15.

21

Therefore, the Court finds that the plain and unambiguous language of Endorsement No. 23 limits the increase in deductible to Securities Claims arising from mergers or acquisitions as "described in Section VI General Conditions (D)(1) and (2)." The Underlying Actions challenge a transaction that does not involving acquisition of a subsidiary so (D)(1) does not apply. In addition, (D)(2) is not involved as the buyback does not involve a situation where assets or liabilities were acquired let alone assets or liabilities that exceed 40% of the total assets or liabilities of CVR Refining. Accordingly, the Court will grant the Partial SJ Motion.

## VI.    CONCLUSION

For the reasons set forth above, the Court finds that no genuine issues of material fact exist, and Plaintiffs are entitled to partial summary judgment on Count I of the Complaint. The summary judgment on Count I only applies to CVR Refining, the General Partner, CVR Holding, CVR Energy and Mr. Lamp.

Dated: November 23, 2021
Wilmington, Delaware


*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc: File&ServeXpress

22